**Nos. 23-3940, 23-3943, 23-3945, 23-3946, 23-3947**

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

IN RE FIRSTENERGY CORPORATION SECURITIES LITIGATION

DIANE OWENS ET AL.,

*Plaintiffs-Appellees*,

V.

FIRSTENERGY CORPORATION ET AL.,

*Defendants-Appellants.*

On Appeal from the U.S. District Court for the Southern District of Illinois,
Nos. 2:20-cv-03785, 2:20-cv-04287, Hon. Chief Judge Algenon L. Marbley

**BRIEF OF AMICI CURIAE THE CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA, THE SECURITIES INDUSTRY AND
FINANCIAL MARKETS ASSOCIATION, EDISON ELECTRIC
INSTITUTE, AMERICAN TORT REFORM ASSOCIATION, AND
AMERICAN PROPERTY CASUALTY INSURANCE ASSOCIATION
IN SUPPORT OF DEFENDANTS AND REVERSAL**

JENNIFER B. DICKEY
KEVIN R. PALMER
U.S. CHAMBER LITIGATION CENTER
1616 H Street NW
Washington, DC 20062

*Counsel for the Chamber of
Commerce
of the United States of America*

EMILY SANFORD FISHER
EDISON ELECTRIC INSTITUTE
701 Pennsylvania Ave., NW
Washington, DC 20004

*Counsel for Edison Electric Institute*

FEBRUARY 16, 2024

DEANNE E. MAYNARD
MORRISON & FOERSTER LLP
2100 L Street, Suite 900
Washington, DC 20037
Telephone: (202) 887-8740
DMaynard@mofo.com

JORDAN ETH
JAMES R. SIGEL
DAVID J. WIENER
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

*Counsel for Amici*

*Additional Counsel Listed on Inside Cover*

KEVIN CARROLL
SECURITIES INDUSTRY AND FINANCIAL
MARKETS ASSOCIATION
1099 New York Ave., NW
Washington, DC 20001
Telephone: (202) 962-7300

*Counsel for the Securities Industry and
Financial Markets Association*

H. SHERMAN JOYCE
LAUREN SHEETS JARRELL
AMERICAN TORT REFORM ASSOCIATION
1101 Connecticut Ave. NW, Suite 400
Washington, DC 20036

*Counsel for the American Tort Reform
Association*

DIANA L. KIM
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA, 94304

*Counsel for Amici*

KENNETH A. STOLLER
AMERICAN PROPERTY CASUALTY
INSURANCE ASSOCIATION
555 12th Street NW, Suite 550
Washington, DC 20004

*Counsel for the American Property
Casualty Insurance Association*

## CORPORATE DISCLOSURE STATEMENT

Amici make the following disclosures under Sixth Circuit Rule 26.1:

**1.    Is any *amicus* a subsidiary or affiliate of a publicly owned corporation?**

No.  The Chamber of Commerce of the United States of America is a non-profit, tax-exempt organization incorporated in the District of Columbia.  It has no parent corporation, and no publicly held company has 10 percent or greater ownership in the Chamber.

The Securities Industry and Financial Markets Association has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

Edison Electric Institute ("EEI") has no parent corporation.  EEI has no outstanding shares or debt securities in the hands of the public, and no publicly owned company has a 10% or greater ownership interest in EEI.

The American Tort Reform Association ("ATRA") has no parent corporation, and no publicly held corporation has a 10% or greater ownership interest in ATRA.

The American Property Casualty Insurance Association ("APCIA") has no parent corporation, and no publicly held corporation has a 10% or greater ownership interest in APCIA.

**2.    Is there a publicly owned corporation, not a party to the appeal or an *amicus*, that has a financial interest in the outcome?**

None known.

Dated:  February 16, 2024          /s/ Deanne E. Maynard
                                     Deanne E. Maynard

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

TABLE OF AUTHORITIES ..................................................................................v

INTERESTS OF AMICI CURIAE...........................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................4

ARGUMENT ..........................................................................................................6

I.    THE DISTRICT COURT'S ERRONEOUS EXPANSION OF *AFFILIATED UTE* UNDERMINES THE RELIANCE REQUIREMENT...............................................................................................6

    A.    The *Affiliated Ute* Presumption Applies Only To Claims Based On Omissions, Not Misstatements Or Half-Truths....................................6

    B.    The District Court Erroneously Applied The *Affiliated Ute* Presumption To Defendants' Alleged Misstatements..........................9

    C.    The District Court's Shortcut Will Enable Plaintiffs To Evade The Important Requirements For Demonstrating Reliance ......................11

II.   THE DISTRICT COURT ABDICATED ITS RESPONSIBILITY UNDER *COMCAST* TO CONDUCT A RIGOROUS ANALYSIS OF PLAINTIFFS' DAMAGES MODEL............................................................14

III.  LEFT UNCORRECTED, THE DISTRICT COURT'S DECISION WILL EXPAND SECURITIES FRAUD CLASS ACTIONS AND IMPOSE SIGNIFICANT COSTS ON AMERICAN BUSINESSES ..........19

    A.    The District Court's Decision Would Expand Securities Fraud Class Actions By Significantly Undermining Both The Reliance Requirement And *Comcast*'s "Rigorous Analysis" Requirement ......19

    B.    The Resulting Expansion Of Securities Fraud Class Actions Would Impose Significant Costs On American Companies And Investors ...22

CONCLUSION ....................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Affiliated Ute Citizens of Utah v. United States*,
   406 U.S. 128 (1972)................................................. 4, 6, 7, 8, 9, 10, 11, 12, 13, 21

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013).....................................................................................6, 13

*Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*,
   77 F.4th 74 (2d Cir. 2023) ...............................................................................12

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)...................................................................................11, 12

*Binder v. Gillespie*,
   184 F.3d 1059 (9th Cir. 1999) ......................................................................7, 10

*Blue Chip Stamps v. Manor Drug Stores*,
   421 U.S. 723 (1975)........................................................................................19

*Bussey v. Macon Cnty. Greyhound Park, Inc.*,
   562 F. App'x 782 (11th Cir. 2014) ..................................................................16

*Cammer v. Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989).....................................................................11

*Chiarella v. United States*,
   445 U.S. 222 (1980)..........................................................................................7

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014) ..............................................................................7

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013).......................................................... 5, 14, 15, 16, 17, 18, 21

*Coopers & Lybrand v. Livesay*,
   437 U.S. 463 (1978)........................................................................................19

*Cruson v. Jackson Nat'l Life Ins. Co.*,
    954 F.3d 240 (5th Cir. 2020) ........................................................16, 18

*Desai v. Deutsche Bank Secs. Ltd.*,
    573 F.3d 931 (9th Cir. 2009) ........................................................10, 13

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011)............................................................................6

*Fox v. Saginaw Cnty., Mich.*,
    67 F.4th 284 (6th Cir. 2023) ..............................................................16

*Freeman v. Laventhol & Horwath*,
    915 F.2d 193 (6th Cir. 1990) ........................................................11, 12

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*,
    141 S. Ct. 1951 (2021)..................................................................11, 12

*In re Initial Public Offerings Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006) ................................................................12

*In re Interbank Funding Corp. Sec. Litig.*,
    629 F.3d 213 (D.C. Cir. 2010)..............................................................8

*Joseph v. Wiles*,
    223 F.3d 1155 (10th Cir. 2000) ............................................................8

*Little v. First Cal. Co.*,
    532 F.2d 1302 (9th Cir. 1976) ............................................................10

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)...........................................................................6, 7

*Miller v. Thane Int'l, Inc.*,
    615 F.3d 1095 (9th Cir. 2010) ............................................................12

*Parko v. Shell Oil Co.*,
    739 F.3d 1083 (7th Cir. 2014) ......................................................16, 18

*In re Rail Freight Fuel Surcharge Antitrust Litig. – MDL No. 1869*,
    934 F.3d 619 (D.C. Cir. 2019)............................................................17

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
  552 U.S. 148 (2008)..................................................................4, 13, 20

*Vervaecke v. Chiles, Heider & Co.*,
  578 F.2d 713 (8th Cir. 1978) ...............................................................8

*In re VHS of Mich., Inc.*,
  601 F. App'x 342 (6th Cir. 2015) .......................................................17

*In re Volkswagen "Clean Diesel" Mkt., Sales Pracs.,*
  *& Prods. Liab. Litig.*,
  2 F.4th 1199 (9th Cir. 2021) ..........................................................8, 10

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017) ...............................................................8, 9

**Statutes**

15 U.S.C. § 78m....................................................................................6

**Other Authorities**

17 C.F.R. § 240.10b-5............................................................................6

17 C.F.R. § 240.10b-5(b) .......................................................................7

M. Arena & B. Julio, *The Effects of Securities Class Action Litigation*
  *on Corporate Liquidity and Investment Policy*,
  50 J. Fin. & Quantitative Analysis 251 (2015) ...........................22

John C. Coffee, Jr., *Reforming the Sec. Class Action: An Essay on*
  *Deterrence & Its Implementation*,
  106 Colum. L. Rev. 1534 (2006)....................................................23

H.R. Conf. Rep. No. 104-369 (1995).....................................................19

Legal Reform, *Risk and Reward: The Securities-Fraud Class Action*
  *Lottery*, http://securities.stanford.edu/research-reports/1996-
  2019/Cornerstone-Research-Securities-Class-Action-Filings-2019-
  YIR.pdf ...........................................................................................23

Matt Levine, "Everything Everywhere Is Securities Fraud,"
    *Bloomberg* (June 26, 2019),
    https://www.bloomberg.com/opinion/articles/2019-06-
    26/everything-everywhere-is-securities-fraud.....................................................21

Paul G. Mahoney, *Precaution Costs & the Law of Fraud in
    Impersonal Markets*, 78 VA. L. REV. 623 (1992) ...............................................23

C. Metzger & B. Mukherjee, *Challenging Times: The Hardening
    D&O Insurance Market*, HARV. L. SCH. FORUM ON CORPORATE
    GOVERNANCE (2020)............................................................................................22

U.S. Chamber Institute for Legal Reform, *Containing the Contagion:
    Proposals to Reform the Broken Securities Class Action System*
    (Feb. 2019), https://instituteforlegalreform.com/wp-
    content/uploads/2020/10/Securities-Class-Action-Reform-
    Proposals.pdf...........................................................................................20, 22

U.S. Chamber Institute for Legal Reform, *Risk and Reward: The
    Securities-Fraud Class Action Lottery* (Feb. 2019),
    https://instituteforlegalreform.com/wp-
    content/uploads/2020/10/Risk_and_Reward_WEB_FINAL.pdf.......................23

Michael Wusterhorn & Gregory Zuckerman, *Fewer Listed
    Companies: Is That Good or Bad for Stock Markets?*, WALL
    STREET JOURNAL (Jan. 4, 2018),
    https://www.wsj.com/articles/fewer-listed-companies-is-that-good-
    or-bad-for-stock-markets-1515100040..............................................................22

## INTERESTS OF AMICI CURIAE[1]

The Chamber of Commerce of the United States of America ("the Chamber") is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before the courts, Congress, and the Executive Branch. To that end, the Chamber regularly files amicus briefs in cases, like this one, that raise issues of concern to the nation's business community.

The Securities Industry and Financial Markets Association ("SIFMA") is the leading trade association for broker-dealers, investment banks, and asset managers operating in the United States and global capital markets. On behalf of the industry's one million employees, SIFMA advocates on legislation, regulation, and business policy affecting retail and institutional investors, equity and fixed income markets and related products and services. SIFMA serves as an industry coordinating body to promote fair and orderly markets, informed regulatory compliance, and efficient market operations and resiliency. SIFMA also provides a forum for industry policy

---

[1] Pursuant to Rule 29(a)(4)(E), amici affirm that no party's counsel authored this brief in whole or in part and that no party, party's counsel, or person other than amici, their members, and their counsel made any monetary contributions to fund the preparation or submission of this brief. Amici have filed a simultaneous motion for leave to file this brief.

and professional development.  SIFMA, with offices in New York and Washington, D.C., is the U.S. regional member of the Global Financial Markets Association.

Edison Electric Institute ("EEI") is the trade association that represents all investor-owned electric utilities in the United States.  EEI's members provide electricity for nearly 250 million Americans, operate in all 50 states and the District of Columbia, and represent 70% of the nation's electric power industry.  The electric power industry is the most capital-intensive industry in the U.S., investing more than $130 billion dollars annually to make the energy grid smarter, stronger, cleaner, more dynamic, and more secure.  EEI regularly files amicus curiae briefs in cases that raise issues of significant concern for the electric power industry, including several amicus filings before federal courts on issues that could harm the industry's ability to raise the private capital necessary to build and maintain the energy grid to serve customers.

The American Tort Reform Association ("ATRA") is a broad-based coalition of businesses, corporations, municipalities, associations, and professional firms that have pooled their resources to promote reform of the civil justice system with the goal of ensuring fairness, balance, and predictability in civil litigation.  For more than three decades, ATRA has filed amicus briefs in cases involving important liability issues.

The American Property Casualty Insurance Association ("APCIA") is the primary national trade association for home, auto, and business insurers. APCIA promotes and protects the viability of private competition for the benefit of consumers and insurers, with a legacy dating back 150 years. APCIA's member companies represent 65% of the U.S. property-casualty insurance market and 76% of the general liability insurance market. On issues of importance to the insurance industry and marketplace, APCIA advocates sound and progressive public policies on behalf of its members in legislative and regulatory forums at the federal and state levels and submits amicus curiae briefs in significant cases before federal and state courts.

Amici have a strong interest in this case. Many of amici's members are subject to federal securities laws and defend against securities class actions. They will be adversely affected by the district court's expansion of *Affiliated Ute*'s presumption of reliance and its erosion of *Comcast*'s requirement to rigorously assess predominance. Amici have long been concerned about the costs securities class actions impose on the American economy. Left uncorrected, the decision below would further increase those costs.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Given the significant costs that even meritless securities fraud class actions impose, courts must rigorously enforce Rule 23(b)(3)'s predominance requirement before certifying a class. Predominance is not satisfied—and no class can be certified—unless plaintiffs establish classwide reliance on defendants' alleged deception and a model for measuring damages across the entire class. The district court's failure to enforce either of these important requirements raises two issues of national concern. By improperly lowering the bar for class certification, the district court's errors will increase the frequency of baseless securities fraud class actions, harming amici's members and American businesses more generally.

First, plaintiffs must be held to their obligation of proving reliance, an "essential element" of fraud. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008). A narrow exception to that obligation allows courts to presume reliance when a plaintiff's claim rests on an omission rather than a misstatement. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972). But the district court improperly expanded that narrow exception by presuming reliance because the plaintiffs' alleged misstatements "painted an incomplete picture of the alleged truth" by "omitting information necessary to qualify or to place into doubt those contentions." R. 435 (Certification Op.) at 9822. That decision would allow the *Affiliated Ute* presumption to swallow the reliance

4

requirement, effectively writing that essential element out of securities law and eliminating an important component of the predominance analysis.

Second, district courts must conduct a "rigorous analysis" of whether a damages model satisfies the predominance requirement. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). The district court here conducted *no* analysis—let alone a "rigorous" one—of plaintiffs' proposed methodology for measuring damages under the Securities Exchange Act of 1934 ("Exchange Act"). As *Comcast* warned, such failure "reduce[s] Rule 23(b)(3)'s predominance requirement to a nullity." *Id.* at 36.

The district court's errors will have far-reaching consequences for many sectors of the American economy. Securities fraud class actions have increased significantly in the last decade. Left uncorrected, the district court's erosion of both the reliance element and the predominance requirement threatens to exacerbate this trend by making class certification a near certainty in many cases and depriving defendants of otherwise available defenses. Such lawsuits impose enormous costs on American businesses, with the threat of massive damages pressuring companies to settle even meritless claims. Neither businesses nor the public benefit from such litigation. This court should reverse the district court's erroneous decision.

**ARGUMENT**

## I.    THE DISTRICT COURT'S ERRONEOUS EXPANSION OF *AFFILIATED UTE* UNDERMINES THE RELIANCE REQUIREMENT

### A.    The *Affiliated Ute* Presumption Applies Only To Claims Based On Omissions, Not Misstatements Or Half-Truths

Section 10(b) of the Exchange Act and Securities and Exchange Commission Rule 10b-5 prohibit making a material misstatement or omission in connection with the purchase or sale of a security.   15 U.S.C.  § 78m;  17 C.F.R.  § 240.10b-5. Plaintiffs alleging securities fraud in violation of these provisions must prove, among other things, "reliance upon the misrepresentation or omission" of the defendant. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460-61 (2013).

Requiring "proof of reliance ensures that there is a proper 'connection between a defendant's misrepresentation and a plaintiff's injury.'"  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011).  "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction—*e.g.,* purchasing common stock—based on that specific misrepresentation."  *Id.*

That method of proof, however, is nearly impossible if there was no misrepresentation on which the plaintiff could have relied—that is, when plaintiffs are challenging a defendant's failure to speak instead of its statements.  In general, only a defendant's statements can give rise to liability for securities fraud. *Matrixx*

*Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44-45 (2011).  Under Rule 10b-5(b), the failure to provide information is fraudulent only where disclosure is needed "to make the statements *made*, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b) (emphasis added).  By contrast, omissions, standing alone, are actionable only if the defendant has a "duty to disclose."  *Matrix Initiatives*, 563 U.S. at 44; *see also City of Pontiac Policemen's & Firemen's Ret. Sys. V. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) ("companies do not have a duty 'to disclose uncharged, unadjudicated wrongdoing'").  Such a duty to disclose only "arises when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'"  *Chiarella v. United States*, 445 U.S. 222, 228 (1980) (bracket in original).

In *Affiliated Ute*, the Supreme Court held that, for a narrow category of omissions claims, courts may presume reliance rather than requiring a plaintiff to prove it.  406 U.S. at 152.  This presumption applies only if two conditions are met: (1) the plaintiff's claim turns on the defendant's nondisclosure, not its misstatements, and (2) the defendant had a duty to disclose.  *Id*.  The Court's purpose in creating this narrow exception for omissions was to address "the difficulty of proving 'a speculative negative'—that the plaintiff relied on what was not said."  *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999).

The *Affiliated Ute* presumption thus applies only where "reliance as a practical matter is impossible to prove" because "no positive statements exist."  *Waggoner v. Barclays PLC*, 875 F.3d 79, 95 (2d Cir. 2017) (quotation marks omitted).  The same reasoning has no force when a plaintiff alleges that affirmative *misstatements* made by the defendant are misleading because they omit some material information (sometimes called "half-truths").  *Id.* at 95-96.  If a plaintiff alleges statements were false or rendered misleading by other undisclosed facts, nothing prevents the plaintiff from proving that it in fact relied on those statements.

For that reason, multiple courts of appeals have recognized that the *Affiliated Ute* presumption applies only to fraud claims based primarily on omissions.  *Id.* at 96 ("The *Affiliated Ute* presumption does not apply to earlier misrepresentations made more misleading by subsequent omissions, or to what has been described as 'half-truths,' nor does it apply to misstatements whose only omission is the truth that the statement misrepresents."); *Vervaecke v. Chiles, Heider & Co.*, 578 F.2d 713, 717 n.2 (8th Cir. 1978); *In re Volkswagen "Clean Diesel" Mkt., Sales Pracs., & Prods. Liab. Litig.*, 2 F.4th 1199, 1208-09 (9th Cir. 2021); *Joseph v. Wiles*, 223 F.3d 1155, 1162-63 (10th Cir. 2000), *abrogated on other grounds by Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497 (2017); *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 220 (D.C. Cir. 2010).

**B.    The District Court Erroneously Applied The *Affiliated Ute* Presumption To Defendants' Alleged Misstatements**

This Court should use this case to clarify the narrow reach of *Affiliated Ute* in two ways: (1) by making clear that *Affiliated Ute* applies *only* to omission-based claims, and (2) by holding that plaintiffs' claims here were not primarily omission-based.

First, this Court should join the well-reasoned opinions of the multiple courts of appeals cited above in holding that *Affiliated Ute* applies only to omission-based claims and reject the district court's analysis to the contrary. R. 435 (Certification Op.) at 9820. The district court concluded that the *Affiliated Ute* presumption applies even in "mixed cases of affirmative misstatements and omissions." *Id.* at 9821. In doing so, it did not even attempt to explain how such an expansion accords with the language or reasoning of *Affiliated Ute*—which, again, is premised on the impossibility of proving reliance on statements never made. *Waggoner*, 875 F.3d at 95.

Second, this Court should reject the district court's conclusion, in the alternative, that plaintiffs' claims were "primarily omissions-based." R. 435 (Certification Op.) at 9821. In fact, plaintiffs accused defendants of nearly 50 alleged affirmative *misstatements*. R. 72 (Compl.) at 1576-92. Plaintiffs thus face no "difficulty of proving 'a speculative negative'" that would prevent them from

proving reliance on those misstatements through ordinary means. *Binder*, 184 F.3d at 1064.

While the district court acknowledged these affirmative "communications" and "statements," it nonetheless treated them as "omissions" because, it stated, "they painted an incomplete picture of the alleged truth" by "omitting information necessary to qualify or to place into doubt those contentions." R. 435 (Certification Op.) at 9821-22. Using that logic, any misstatement could be recast as an omission: all alleged false statements involve a corresponding "omission" in the "failure to disclose which facts in the representation are not true." *Volkswagen*, 2 F.4th at 1208 (refusing to apply *Affiliated Ute* presumption where the plaintiff claimed to allege "an omission regarding Volkswagen's use of defeat devices, but that omission [was] simply the inverse of . . . certain affirmative statements about environmental compliance and financial liabilities"); *see also Little v. First Cal. Co.*, 532 F.2d 1302, 1305 n.4 (9th Cir. 1976). The court's approach would thus "permit the *Affiliated Ute* presumption to swallow the reliance requirement almost completely." *Desai v. Deutsche Bank Secs. Ltd.*, 573 F.3d 931, 941 (9th Cir. 2009) (refusing to apply *Affiliated Ute* presumption where plaintiffs alleged defendants "failed to disclose their active manipulation of GENI stock") (quotation marks and citation omitted).

10

**C.    The District Court's Shortcut Will Enable Plaintiffs To Evade The Important Requirements For Demonstrating Reliance**

The consequences of such a boundless expansion of *Affiliated Ute*'s narrow rule would be significant.  Following the district court's reasoning, plaintiffs could easily plead fraud claims as omissions rather than misstatements to avoid their burden of proving reliance.  Where *Affiliated Ute* does not apply, plaintiffs typically must either prove actual reliance or establish the conditions necessary for invoking the fraud-on-the-market presumption of reliance under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  But the district court's decision would permit plaintiffs to circumvent those requirements by disguising misstatements as omissions.

To establish a rebuttable presumption of reliance based on "fraud-on-the-market" under *Basic*, plaintiffs must prove, among other things, "that the stock traded in an efficient market." *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951, 1958 (2021).  Courts have determined that at least five factors are relevant to determining whether a market is efficient: "(1) a large weekly trading volume; (2) the existence of a significant number of reports by securities analysts; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S-3 Registration Statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases." *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990) (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989)); *see also*

*Miller v. Thane Int'l, Inc.*, 615 F.3d 1095, 1103 (9th Cir. 2010) (describing *Cammer*'s test as a "high bar" and "rigorous standard").

The *Basic* presumption is unavailable if plaintiffs are unable to meet these requirements and prove the market was efficient. Such a showing may be particularly difficult, for example, in cases involving initial public offerings or where securities are thinly traded. *See, e.g., Freeman*, 915 F.2d at 198-99; *In re Initial Public Offerings Sec. Litig.*, 471 F.3d 24, 42-43 (2d Cir. 2006). Additionally, even where a plaintiff makes the required showing, the defendant may still rebut the presumption through "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Goldman Sachs*, 141 S. Ct. at 1958 (quotation marks omitted); *see also Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 96-105 (2d Cir. 2023) (applying this rule to reverse the district court's certification of a class because defendant had rebutted *Basic*'s presumption of reliance).

By contrast, the *Affiliated Ute* presumption requires no inquiry into market efficiency—let alone the proof of actual reliance that would be required if the *Basic* presumption were unavailable. *See Affiliated Ute*, 406 U.S. at 153-54 ("All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision."). The district

12

court's shortcut thus fatally undermines the critical and purposeful role that the reliance requirement often plays as a gatekeeper to class certification and a bulwark against abusive securities litigation. *See Desai*, 573 F.3d at 940 (whether "putative class can meet the requirements of Rule 23(b)(3)" often turns on whether each plaintiff "would have to prove reliance"); *cf. Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 463 (2013) (absent a presumption, "the requirement that Rule 10b-5 plaintiffs establish reliance would ordinarily preclude certification of a class action seeking money damages because individual reliance issues would overwhelm questions common to the class").

Thus, the expansion of *Affiliated Ute* will significantly erode the reliance requirement. That, in turn, will undermine defendants' right to hold plaintiffs to their burden of proof, make class certification a near certainty in many cases, and reshape post-certification litigation on the merits. The end result will be to lower the barrier to speculative securities fraud class actions that use the threat of massive class-wide damages to extract settlements. That result is particularly problematic given that Section 10(b) is a judicially created cause of action—one the Supreme Court has warned "should not be extended beyond its present boundaries." *Stoneridge*, 552 U.S. at 165 ("Concerns with the judicial creation of a private cause of action caution against its expansion."). Any decision to expand securities-fraud class actions so significantly should be "for Congress, not for [the courts]." *Id.*

13

## II.   THE DISTRICT COURT ABDICATED ITS RESPONSIBILITY UNDER *COMCAST* TO CONDUCT A RIGOROUS ANALYSIS OF PLAINTIFFS' DAMAGES MODEL

In *Comcast*, the Supreme Court held that courts must undertake a "rigorous analysis" to ensure satisfaction of "Rule 23(b)(3)'s predominance criterion" before certifying a class.  569 U.S. at 33-34.  Specifically, courts must scrutinize whether a plaintiff's damages model "establish[es] that damages are capable of measurement on a classwide basis" in a manner "consistent with [plaintiff's] liability case." *Id.* at 34-35.  This "rigorous analysis" is particularly important in securities fraud class actions, where a presumption of reliance may already obscure individual differences by removing an essential element of the plaintiff's proof.

The district court here abdicated its responsibility under *Comcast*.  Plaintiffs brought claims under both the Exchange Act and the Securities Act of 1933 ("Securities Act").  The district court did not, however, analyze plaintiffs' methodology for measuring damages under the Exchange Act at all, let alone "rigorously."  Instead, the court merely stated that "predominance exists with respect to damages for the same reasons" that it did for plaintiffs' other claims under the Securities Act.  R. 435 (Certification Op.) at 9819; *see also id.* at 9813 (single sentence pointing to earlier analysis "with respect to Plaintiffs' Securities Act claims").

14

But the district court's earlier analysis of plaintiffs' Securities Act damages model relied almost entirely on the existence of a statutory formula for those claims. R. 435 (Certification Op.) at 9811 (plaintiffs' "formula is consistent with the formulas prescribed by §§ 11 and 12(a)(2) and is standard *in Securities Act cases*" (emphasis added)). Unlike the Securities Act, the Exchange Act provides no such statutory formula. As the defendants explain, the Securities Act damages model makes no sense when applied to claims under the Exchange Act, which requires different proof and compensates a different harm. Appellant's Opening Br. 49-50. But the district court never engaged with those arguments. If such cursory treatment were sufficient, *Comcast*'s protections would be meaningless for an entire class of claims—and there is no guarantee that such a dilution of *Comcast*'s "rigorous analysis" would remain confined to securities fraud cases.

Nor can this result be salvaged based on the alternative argument plaintiffs advanced in their reply brief below: that *Comcast* should not apply to this case at all. R. 346 (Pl.'s Reply in Support of Class Certification) at 3098. Attempting to limit *Comcast*'s rule to its facts, plaintiffs claimed *Comcast* applies only when plaintiffs allege multiple theories of liability, some of which have been dismissed, such that a "rigorous analysis" is needed to ensure that the damages model counts only damages attributable to the surviving theories. *Id.* The district court did not

accept this attempt to significantly narrow *Comcast*. To the extent plaintiffs again press this argument, this Court should not either.

*Comcast* broadly instructed that the preponderance requirement calls for a "rigorous analysis" to ensure that plaintiffs' proposed damages model "establish[es] that damages are capable of measurement on a classwide basis" and is "consistent with [their] liability case." 569 U.S. at 33-34. The Court did not state that this requirement only applied in cases where plaintiffs alleged multiple theories of liability, as plaintiffs here suggest. To be sure, the Court did conclude that the proposed damages model in that case failed to satisfy preponderance because it could not separate damages attributable to dismissed theories of liability from those attributable to plaintiffs' sole surviving theory. *Id.* at 37-38. But that was because those were the facts before the Court. Of course, the rigorous analysis required will look different when applied to different facts and damages methodologies.

For that reason, this Court and others have applied *Comcast*'s "rigorous analysis" requirement to a wide range of factual circumstances. They have done so without regard to whether plaintiffs alleged multiple theories of liability. *See, e.g., Fox v. Saginaw Cnty., Mich.*, 67 F.4th 284, 300-01 (6th Cir. 2023); *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 258 (5th Cir. 2020); *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1086-87 (7th Cir. 2014); *Bussey v. Macon Cnty. Greyhound*

*Park, Inc.*, 562 F. App'x 782, 789-90 (11th Cir. 2014); *In re Rail Freight Fuel Surcharge Antitrust Litig. – MDL No. 1869*, 934 F.3d 619, 623-24 (D.C. Cir. 2019).

In advocating a contrary rule, plaintiffs rely primarily on a statement of this Court taken out of context. R. 346 (Pl.'s Reply in Support of Class Certification) at 3098 (quoting *In re VHS of Mich., Inc.*, 601 F. App'x 342, 344 (6th Cir. 2015)). In *VHS*, this Court stated that *Comcast* "applies where multiple theories of liability exist, those theories create separable anticompetitive effects, and the combined effects can result in aggregated damages." 601 F. App'x at 344. But it did not hold that *Comcast*'s "rigorous analysis" has *no* application beyond those limited circumstances. *Id.* To the contrary, after concluding that the facts in *VHS* did not "raise the aggregated-damages concern present in *Comcast*," the Court stated: "*Additionally*, 'after *Comcast* [a] class must be able to show that their damages stemmed from the defendant's actions that created the legal liability.'" *Id.* (emphasis added; alteration in original). This Court then proceeded to analyze whether the plaintiffs' damages methodology met that requirement, notwithstanding its earlier conclusion that the facts did not match those in *Comcast*. *Id.*

Adhering to this requirement is particularly important where, as here, plaintiffs have alleged a complex liability theory that supposedly spans a multi-year class period and nearly 50 different alleged misstatements. If plaintiffs choose to allege sprawling schemes of fraud in order to create larger classes and damages

17

figures, they must be required to establish that those damages can be proven across the entire class and tied to their liability theory. *See, e.g., Parko*, 739 F.3d at 1085-86 (*Comcast* required scrutiny of damages model where plaintiffs alleged harm from pollution "occurr[ing] over a 90-year period and involv[ing] acts and omissions charged against the six defendants, and maybe other polluters as well"); *Cruson*, 954 F.3d at 258 (district court's analysis insufficient for "more complex damages"). Otherwise, *Comcast* warned that failure to scrutinize a damages model "would reduce Rule 23(b)(3)'s predominance requirement to a nullity." 569 U.S. at 36.

Without correction, the district court's failure to follow *Comcast* threatens far-reaching consequences. The predominance requirement was designed to be "demanding" because the Supreme Court recognized that Rule 23(b)(3) was an "adventuresome innovation" likely to be invoked in "situations 'in which class-action treatment is not as clearly called for.'" *Id.* at 34. Eroding this important safeguard will make it easier for plaintiffs to transform what should be individual claims into massive class actions capable of exerting outsized settlement pressures on even innocent defendants. Such risks extend to all manner of claims, not just securities litigation. This Court should reverse the district court's erroneous decision and remind all district courts in this circuit of their important obligation to prevent the Supreme Court's warning from becoming a reality.

## III.  LEFT UNCORRECTED, THE DISTRICT COURT'S DECISION WILL EXPAND SECURITIES FRAUD CLASS ACTIONS AND IMPOSE SIGNIFICANT COSTS ON AMERICAN BUSINESSES

### A.  The District Court's Decision Would Expand Securities Fraud Class Actions By Significantly Undermining Both The Reliance Requirement And *Comcast*'s "Rigorous Analysis" Requirement

Both Congress and the Supreme Court have recognized that securities lawsuits pose "a danger of vexatiousness different in degree and in kind" from other litigation. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 739 (1975); *see* H.R. Conf. Rep. No. 104-369, at 31 (1995) (discussing securities fraud plaintiffs' "abusive practices").  Because "[t]he very pendency of the lawsuit may frustrate or delay normal business activity of the defendant," even suits with little chance of success at trial carry outsized settlement values. *Blue Chip Stamps*, 421 U.S. at 740.  That is especially true given "[t]he prospect of extensive deposition of the defendant's officers and associates and the concomitant opportunity for extensive discovery of business documents" in securities suits. *Id.* at 741.

Moreover, because, as here, securities lawsuits are often brought as class actions, high defense costs and the potential for massive liability create even stronger pressures on defendants to settle regardless of merit. *See Coopers & Lybrand v. Livesay*, 437 U.S. 463, 476 (1978) ("Certification of a large class may so increase the defendant's potential damages liability and litigation costs that he may find it economically prudent to settle and to abandon a meritorious defense.").  Indeed,

between 1997 and 2018, less than 1 percent of federal securities class actions reached a trial verdict while 49 percent ended in settlement. Stanford Clearinghouse, *Securities Class Action Filings: 2019 Year in Review* 16 (2020).[2] Aware of these dynamics, "plaintiffs with weak claims" can "extort settlements from innocent companies." *Stoneridge*, 552 U.S. at 163.

These dangers are particularly present in "event-driven" lawsuits like this one. A pattern of litigation has emerged in which plaintiffs rush to file securities claims immediately after unfavorable news coverage causes a company's stock price to fall, alleging that the company should have disclosed the risks or misconduct that led to the price drop. *See* U.S. Chamber Institute for Legal Reform, *Containing the Contagion: Proposals to Reform the Broken Securities Class Action System* 9 (Feb. 2019).[3] Such plaintiffs routinely seize on vague, innocuous statements that (they allege) take on new meaning in light of the latest headline news. For example, plaintiffs here base their theory of liability in part on defendants' proxy statements expressing a commitment to "good corporate governance," "integrity," "openness,"

---

[2] http://securities.stanford.edu/research-reports/1996-2019/Cornerstone-Research-Securities-Class-Action-Filings-2019-YIR.pdf.
[3] https://instituteforlegalreform.com/wp-content/uploads/2020/10/Securities-Class-Action-Reform-Proposals.pdf.

and "trust."  R. 72 (Compl.) at 1580-1581; *see, e.g.,* Matt Levine, "Everything Everywhere Is Securities Fraud," *Bloomberg* (June 26, 2019).[4]

Rule 10b-5's reliance requirement and *Comcast*'s "rigorous" damages inquiry play important roles in stemming the tide of frivolous securities class actions, including such event-driven lawsuits.  Requiring plaintiffs to prove reliance on generic, banal statements may defeat baseless lawsuits (or at least preclude class certification).  And subjecting their damages models to rigorous analysis may prevent them from asserting sprawling liability theories that attempt to use loosely related statements to span long class periods, in an effort to increase the potential damages exposure and thus their leverage to negotiate a settlement.

But the district court's expansion of *Affiliated Ute* and erosion of *Comcast* removes these important checks on runaway event-driven litigation.  If the decision below is affirmed, enterprising plaintiffs (and their lawyers) need only wait for a company to announce negative news resulting in a decline in its stock price, scour the company's prior SEC filings for any vaguely related generic statement, and bring a class action asserting that the statement was actually a misleading omission of the facts underlying the negative news.  Expanding the number of such cases in which classes are certified will increase the already enormous pressure on defendants to

---

[4] https://www.bloomberg.com/opinion/articles/2019-06-26/everything-everywhere-is-securities-fraud

settle securities fraud class actions without regard to merit. This will further encourage plaintiffs and inundate businesses with even more frivolous litigation.

**B.    The Resulting Expansion Of Securities Fraud Class Actions Would Impose Significant Costs On American Companies And Investors**

The growth of these securities class actions imposes considerable costs on American businesses and investors. According to one study, as many as one in eleven S&P 500 companies are sued annually in a securities class action. *Containing the Contagion, supra,* at 11. The costs of such litigation are spread to all U.S. companies, which must pay higher premiums for liability insurance, hold more cash on hand to prepare for future settlements instead of using that money for capital expenditures, and divert management and employee time and resources to manage litigation. *See* C. Metzger & B. Mukherjee, *Challenging Times: The Hardening D&O Insurance Market*, HARV. L. SCH. FORUM ON CORPORATE GOVERNANCE (2020)[5]; M. Arena & B. Julio, *The Effects of Securities Class Action Litigation on Corporate Liquidity and Investment Policy*, 50 J. FIN. & QUANTITATIVE ANALYSIS 251, 251 (2015). In this environment, some companies may avoid going public altogether, depriving the public of valuable investment opportunities. In 2018, the number of publicly traded companies listed on U.S. exchanges was less than half the number in 1996. *See* Michael Wusterhorn & Gregory Zuckerman, *Fewer Listed*

---

[5] https://corpgov.law.harvard.edu/2020/01/29/challenging-times-the-hardening-do-insurance-market.

*Companies: Is That Good or Bad for Stock Markets?*, WALL STREET JOURNAL (Jan. 4, 2018).[6]

These costs are not offset by any public policy benefits. Most securities class settlements merely transfer wealth between two innocent (and often overlapping) groups of shareholders: those who currently own the company's stock and those who purchased it during the class period. U.S. Chamber Institute for Legal Reform, *Risk and Reward: The Securities-Fraud Class Action Lottery* 4 & n.16 (Feb. 2019).[7] And because high defense costs raise insurance premiums, the price of which is passed on to shareholders, "it is an open question" whether such settlements "actually produce[] any net recovery" at all. John C. Coffee, Jr., *Reforming the Sec. Class Action: An Essay on Deterrence & Its Implementation*, 106 COLUM. L. REV. 1534, 1547 (2006). Moreover, the power of even frivolous securities class actions to generate massive settlements may also cause issuers of securities to avoid speaking as much as possible, depriving the market of valuable information. *See* Paul G. Mahoney, *Precaution Costs & the Law of Fraud in Impersonal Markets*, 78 VA. L. REV. 623, 663 (1992).

---

[6] https://www.wsj.com/articles/fewer-listed-companies-is-that-good-or-bad-for-stock-markets-1515100040
[7] https://instituteforlegalreform.com/wp-content/uploads/2020/10/Risk_and_Reward_WEB_FINAL.pdf.

23

The district court's erosion of important protections for class action defendants will further increase these costs without any countervailing benefits.

## CONCLUSION

This Court should reverse the district court's grant of class certification.

Dated: February 16, 2024

Respectfully submitted,

/s/Deanne E. Maynard

JENNIFER B. DICKEY
KEVIN R. PALMER
U.S. CHAMBER LITIGATION CENTER
1616 H Street NW
Washington, DC 20062
Telephone: (202) 463-5337

*Counsel for the Chamber of Commerce of the United States of America*

EMILY SANFORD FISHER
EDISON ELECTRIC INSTITUTE
701 Pennsylvania Ave., NW
Washington, D.C. 20004

*Counsel for Edison Electric Institute*

KEVIN CARROLL
SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION
1099 New York Ave, NW
Washington, DC 20001
Telephone: (202) 962-7300

*Counsel for the Securities Industry and Financial Markets Association*

H. SHERMAN JOYCE
LAUREN SHEETS JARRELL
AMERICAN TORT REFORM ASSOCIATION
1101 Connecticut Ave. NW, Suite 400
Washington, DC 20036

*Counsel for the American Tort Reform Association*

DEANNE E. MAYNARD
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Telephone: (202) 887-8740
DMaynard@mofo.com

JORDAN ETH
JAMES R. SIGEL
DAVID J. WIENER
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

DIANA L. KIM
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA, 94304

*Counsel for Amici*

KENNETH A. STOLLER
AMERICAN PROPERTY CASUALTY INSURANCE ASSOCIATION
555 12th Street NW, Suite 550
Washington, DC 20004

*Counsel for the American Property Casualty Insurance Association*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 5,146 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Sixth Circuit Rule 32(b), as determined by the word-counting feature of Microsoft Word.

This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface, including serifs, using Microsoft Word 2022 in Times New Roman 14-point font.

Dated:  February 16, 2024                    /s/ Deanne E. Maynard
                                                                          Deanne E. Maynard

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system on February 16, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


Dated:  February 16, 2024         /s/ Deanne E. Maynard
                                             Deanne E. Maynard